**UNITED STATES of America, Plaintiff,**

v.

**GREGORY PARK, SECTION II, INC., et al., Defendants.**

**Civ. A. No. 1310–73.**

United States District Court,
D. New Jersey.

March 26, 1974.

Jonathan L. Goldstein, U. S. Atty., by William A. Carpenter, Jr., Asst. U. S. Atty., Newark, N. J., for plaintiff.

Ravin & Ravin, by David N. Ravin, Newark, N. J., for defendant, Gregory Park, Section II, Inc.

## OPINION

LACEY, District Judge:

The United States sues to foreclose upon two mortgages held by the Secre-

tary of Housing and Urban Development (HUD) on two high rise apartment complexes, Gregory Park Section 1 (GP 1) and Gregory Park Section 2 (GP 2), owned by the defendant Gregory Park, Section II, Inc. (GP II). The Government claims that defendant has defaulted on payments due, has made prohibited advances to affiliates, and otherwise breached the mortgages and other agreements between the parties. Defendant resists, stating it is not in default; that if it is, plaintiff is to blame; and that the Government, in regulating the rent levels in the two buildings, would not allow rent increases in an amount sufficient for defendant to meet its payment obligations and to recover a reasonable return on its investment. By way of counterclaim, defendant seeks an affirmative recovery of a reasonable investment return allegedly denied it by reason of the foregoing.

The following constitutes my findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).

This court has jurisdiction by virtue of 28 U.S.C. § 1345.

This is only one of five related actions presently before the court involving the Padula enterprises.[1] The facts developed in the preliminary stages of these various matters have been introduced into this proceeding largely through extensive stipulations between the parties (paragraphs thereof will be hereinafter referred to as (St. ——), and Joint Exhibits (J.E. ——)).

The Government is seeking to foreclose mortgages held by HUD on each of five buildings (including GP 1 and 2) owned by the Padula-controlled and run

---

1. In addition to the instant action they are: United States v. Gregory Park, Section III, Inc., Civ.No. 1734–73, seeking foreclosure upon the third building, which together with the two buildings involved herein, from the Gregory Park complex in Jersey City, New Jersey; Gregory Park, Section III, Inc. v. Lynn, Civ.No. 1562–73, a suit against the Secretary of HUD paralleling defendant's counterclaim herein; United States v. Leo Neiwirth, Civ.No. 1603–73, a suit against the Receiver for the Chapter XI debtors Mid-

Center Redevelopment Corp., Arthur H. Padula Construction Corp. and Arthur H. Padula, seeking a constructive trust upon funds that are alleged to have been improperly transferred to the debtors' estate from the defendant herein; United States v. Arthur H. Padula, Weequahic Park Plaza, and Weequahic Park Towers, Civ.No. 74–156, seeking foreclosure on the Weequahic Park Plaza and Weequahic Park Tower, both in Newark, New Jersey, and each owned by Arturn H. Padula.

companies, and constructed or purchased with HUD's assistance. These apartment complexes have all been managed by Arthur H. Padula t/a Arthur H. Padula Management Co., and most have been constructed by Arthur H. Padula Construction Corp. (AHPCC), which Mr. Padula owns. The defendant, which owns GP 1 and GP 2, is the wholly owned subsidiary of Mid-Center Redevelopment Corp. (Mid-Center), which in turn is wholly owned by Arthur H. Padula. Mr. Padula is also the President of Mid-Center and the defendant (St. 25), and, as well, of Gregory Park Section 3, Inc. (GP 3), which owns a high rise apartment house across from GP 1 and GP 2. The three together from the Gregory Park complex in Jersey City, New Jersey. GP 3 is also a wholly owned subsidiary of Mid-Center.[2] In addition, Mr. Padula owns two apartment houses in Newark known as the Weequahic Park Tower and the Weequahic Park Plaza (J.E. 64); and through Mid-Center and AHPCC, he caused to be constructed two additional apartment houses in Newark, Zion Towers and Carmel Towers (St. 110, J.E. 21). Finally, Mr. Padula, t/a Arthur H. Padula Management Co., manages the Weequahic Park Tower; the Weequahic Park Plaza; the Zion Towers; the Carmel Towers; until September 11, 1973, GP 1 and GP 2 (St. 29); and, until February 25, 1974, GP 3.[3] HUD holds the mortgages on all of these buildings, except Zion and Carmel Towers.

## BACKGROUND

On June 12, 1961 the Federal Housing Administration (FHA) insured a $5,517,200 loan by the National State Bank of Newark to Gregory Park No. 1, Inc. for the construction of a high rise apartment building located in Jersey City, New Jersey, hereinabove and hereinafter referred to as GP 1. This loan was insured pursuant to Section 220 of the National Housing Act, as amended, 12 U.S.C. § 1715k, to aid in the rehabilitation of blighted areas. See 1955 U.S. Cong. & Admin.News p. 2918.

Thereafter defendant GP II, a limited dividend housing corporation, was formed, pursuant to the New Jersey Limited Dividend Housing Corporations Act, N.J.S.A. 55:16–1 et seq. (St. 2), and its Certificate of Incorporation was approved by the Public Housing and Development Authority, Department of Conservation and Economic Development of the State of New Jersey, and filed on October 30, 1964 (St. 111, J.E. 94). One of defendant's corporate purposes (Certificate of Incorporation, Art. II, ¶¶ b and c) was to obtain financing for the construction and ownership of rental housing with the assistance of mortgage insurance under the National Housing Act.

Prior to defendant's incorporation, the FHA, pursuant to 12 U.S.C. § 1715k(d)(3)(A)(i), issued a Project Income Analysis and Appraisal for GP 2 on FHA form 2264, dated August 31, 1964 (St. 113, J.E. 96), revised and reissued on November 23, 1964 (St. 15a, J. E. 9). The amount of mortgage insurance the FHA can issue is limited to a fixed percentage of the estimated replacement cost of the property, which, in the revised form, was set at $7,592,811. The form also included, *inter alia*, esti-

2. Although of no concern here, it is noted that Mid-Center's sole ownership of the stock of GP 3 has been questioned by objecting creditors of the Chapter XI proceeding. Upon a petition for review in bankruptcy, when presented with stock certificates of GP 3 issued in the name of Arthur H. Padula, and other facts which were not before the bankruptcy court, this court remanded the proceedings to the bankruptcy court for further consideration in light of the additional facts. See In re Mid-Center Redevelopment Corp., B. 1115–70, 1 FBA 567 (D.N.J. January 3, 1974).

3. On September 11, 1973 the court appointed a temporary receiver of rents and profits of GP 1 and GP 2 pending the instant action. United States v. Gregory Park, Section II, Inc. (D.N.J. September 21, 1973) (J.E. 20). Similarly, a receiver was appointed for GP 3 on February 25, 1974. United States v. Gregory Park, Section III, Inc. (D.N.J.February 20, 1974).

mates of income, operating expenses (including management fees), and, under the heading "Estimated Replacement Cost", a section for carrying charges, financing, and Builders' and Sponsors' profit and risk.

On February 4, 1965, the FHA agreed to insure all advances to the defendant by the State Bank of Albany for construction of GP 2 (St. 16a); and on that same date the State Bank of Albany loaned $6,790,000 to the defendant, taking defendant's mortgage note (St. 17, J.E. 10) and a mortgage (St. 18, J.E. 11), covering GP 2, and dated February 4, 1965. Also on the same date, defendant entered into a regulatory agreement with the Federal Housing Commissioner (St. 20a, J.E. 15), the defendant agreeing to abide by the restrictions and regulations recited therein in exchange for the FHA's issuance of mortgage insurance to the mortgagee. The mortgagee, the State Bank of Albany, obtained further security for its loan to the defendant in the form of a security agreement and financing statement covering all personal property of GP 2 (St. 19, J.E. 12, 13, 14).

On December 20, 1966 defendant, pursuant to the New Jersey Limited Dividend Housing Corporations Act, entered into an agreement with the City of Jersey City to have GP 2 exempted from all municipal property taxes for 20 years, upon the condition that it pay an annual service charge in lieu of taxes (service charge) within 60 days after the end of each calendar year, which generally equals 15 percent of the gross shelter rents (St. 21a, J.E. 16). This agreement was to result in substantial savings for defendant and relieved it of property taxes equivalent to approximately 30 to 40 percent of gross rents.

On January 19, 1967 defendant received a third Project Income Analysis and Appraisal on FHA form 2264 covering GP 2 (St. 115, J.E. 97) but listing no replacement value because it was is-

sued as part of a rental increase authorization, authorized on or about July 21, 1967. In June 1968 the mortgage covering GP2 was assigned to the Comptroller of the State of New York as Trustee of the Common Retirement Fund, and pursuant to an option exercised by that mortgagee in January 1971, it is now held by HUD (St. 22–24).

Approximately nine months after defendant gave its mortgage note and mortgage for GP 2, the FHA, on November 2, 1965, issued a Project Income Analysis and Appraisal on form 2264 for GP 1, estimating the replacement cost, before rehabilitation, at $7,061,043 (St. 5a, J.E. 1). Then, on December 30, 1966, defendant entered into an agreement to buy GP 1 from the FHA for $100,000 and a note and mortgage for $6,625,000 (St. 6, J.E. 2). The contract of sale required Mr. Padula to guarantee personally any operating deficits of both GP 1 and GP 2 for a period of two years from the closing, to pledge the stock of GP II and GP 3[4] as security, and to assign to the FHA all dividends from GP 3 for a three-year period for this purpose. FHA, as the seller, disclaimed all representations as to the physical condition or valuation of the building.

On February 10, 1967 defendant took title to GP 1 from HUD pursuant to the aforesaid terms and conditions (St. 8), and gave to HUD its mortgage note, mortgage, and security agreement covering GP 1 (St. 9, 10, 11, J.E. 4–7). On the same date, defendant entered into a regulatory agreement for GP 1 with the Federal Housing Commissioner (St. 12a, J.E. 8) and entered into an agreement with Jersey City to have GP 1 exempt from all property taxation for 20 years upon the condition that it pay within 60 days after the end of each calendar year an annual service charge, again amounting to approximately 15 percent of the gross shelter rent (St. 7a, J.E. 3).

4. The facts surrounding the pledge by Mr. Padula of the GP 3 were of crucial impor-

tance in the petition for review in bankruptcy referred to at note 2 *supra*.

On September 18, 1970 Mid-Center, AHPCC, and Arthur H. Padula, individually, filed a Petition for Arrangement under Chapter XI of the Bankruptcy Act and Leo Neiwirth, Esq. was appointed receiver (St. 26, 27).[5] The defendant itself was not made a debtor in the Chapter XI proceeding; however, because of the estate's ownership of the defendant's stock, Mr. Neiwirth immediately commenced overseeing defendant's operations, and those of GP 3, and continued to do so until December 18, 1972, when the Plan of Arrangement was confirmed by the bankruptcy court and the debtors were revested with their assets.[6] Mr. Padula continued to act for defendant in a managerial capacity during the term of the Receivership (T. 94) and no action was taken by the Receiver without Mr. Padula's knowledge and consent. As of the filing of the Chapter XI proceeding, defendant and GP 3 had outstanding and unpaid bills to general creditors of approximately $500,000 (St. 71). Moreover from September 18, 1970 until April 10, 1971 defendant defaulted on the mortgage notes and mortgages held by HUD covering GP 1 and GP 2 by not making a single required payment (St. 35, 70), while it accumulated large sums of cash which were converted to certificates of deposit.

On or about November 16, 1970, negotiations with the Government were commenced by Mr. Padula to persuade HUD to forego action on the existing defaults and defer principal payments for one year. Thus, on November 16, in confirmation of an earlier telephone conversation, Mr. Padula wrote to Julian B. McKay, Acting Director, Loan and Contract Servicing Division of HUD, and advised that he, and his related corporations, with the exception of the defendant, had filed a Chapter XI petition, and that the debtors were prepared to submit a plan to the bankruptcy court, to fund it, and be discharged on or about December 31, 1970 (St. 31a, J.E. 90). He asked that HUD agree to a workout agreement whereby the amortization and reserve for replacement payments due under the GP 1 and GP 2 mortgages would be waived for one year. Extensive discussions were then held between Mr. Padula and various HUD representatives. Mr. Padula stressed the loss the Government would suffer if forced to sell the buildings after foreclosure, and that foreclosure would mean loss of the property tax exemption from Jersey City. Thereafter, on February 23, 1971 Mr. Neiwirth wrote a letter to Mr. McKay in which he said that, as Mid-Center's bankruptcy receiver, he was man-

5. It is noted that on July 10, 1970, an opinion was rendered in the Superior Court of New Jersey, Chancery Division, holding AHPCC liable on secured loans of over $500,000 to a group of investors known as the Birnbaum group, and entitling that group to the pledge of GP 3 stock. The Chapter XI petition was filed, however, before judgment could be entered in that action. *See* this court's opinion cited in note 2 *supra.*

6. On September 10, 1973, the bankruptcy court ruled that the property of defendant was not property of the debtors, notwithstanding the debtors' stock ownership of defendant, and therefore was not within the jurisdiction of the bankruptcy court. An appeal from this decision was not pursued by either of the parties herein. Relying upon this decision, on February 19, 1974, upon a motion to dismiss for lack of subject matter jurisdiction, I ruled that the Receiver was

without authority to act on behalf of GP II in making certain transfers of its funds, in excess of $250,000, to the debtors' estate. United States v. Neiwirth, 370 F.Supp. 929 (D.N.J.1974). Although this opinion puts in question the Receiver's authority to have taken any action on behalf of the defendant, it is clear that the Government was informed of the nature of the Chapter XI (J. E. 90) and of Mr. Neiwirth's stewardship (J.E. 24) and did not object to same. In fact, there was testimony that if Mr. Neiwirth had not been in control of the defendant and it was solely in the control of Mr. Padula, the Government would have been more reluctant to negotiate with it (T. 38). In any event, although Mr. Neiwirth did on occasion correspond with HUD, plaintiff's dealings with defendant, during the Chapter XI Receivership, as well as prior and subsequent thereto, were almost exclusively with Mr. Padula.

aging the defendant and that on February 9, 1971 the bankruptcy court had approved a Plan of Arrangement (St. 31b, J.E. 24). Mr. Neiwirth advised that Mr. Padula needed $1,500,000 to fund the approved Plan and requested that HUD recast the five mortgages it held on GP 1, 2 and 3 and the Weequahic Park Tower and Plaza by increasing them a total of $1,425,502 and waiving the amortization payments until April 1972. Discussions continued between Mr. Padula and HUD officials until April 1971. On April 1, 1971 Mr. McKay addressed a letter to Mr. Padula questioning his good faith in his offer of November 16, 1970 (J.E. 91). Nevertheless, on April 16, 1971 Robert P. Kalish, the Deputy Director of the Loan and Contract Servicing Division of HUD, wrote to Mr. Padula setting forth the minimum conditions which HUD insisted would be required before it would agree to forebear on foreclosing the mortgages (St. 33, J.E. 26):

1. Delinquent service charges to the date of any Work-Out Agreement must be brought current by a lump sum cash payment. We calculate this figure to be $42,530 as of March 31, 1971.

2. All real estate taxes must be current.

3. All tenants' security deposits must be fully funded.

4. Commingling of funds among projects or advances to affiliated companies will not be tolerated and a violation of this provision will result in immediate cancellation of the appropriate Work Out Agreement.

5. Gregory I, 031–32007; Gregory II, 035–32015; Gregory III, 031–55017; and Weequahic Towers, 031–00204.

A monthly payment for a one year period equal to service charge, tax accrual and interest plus $\frac{1}{60}$ of the respective interest delinquency. Beginning the second year, a monthly payment equal to service charge, tax accrual and interest plus a supplemental payment equal to the sum of the respective amortization payment and $\frac{1}{60}$th of the respective interest delinquency.

\* \* \* \* \* \*

Additionally, Kalish's letter questioned the continuing of Mr. Padula's management of the projects and said that a full explanation of defendant's disbursements totalling $359,705 to Mr. Padula's related corporations now in bankruptcy was in order.

By letter of April 24, 1971 Mr. Padula replied to Mr. Kalish, stating in part:

1. *Delinquent service charges:* We hereby agree to pay a lump sum cash payment computed as of April 30, 1971 on or before May 10, 1971, during which period we presume that you will have prepared the necessary agreements and that they will be approved and executed to everyone's satisfaction.

2. *Real Estate Taxes:* All real estate taxes will be current.

3. *Tenants security deposits:* Tenants security deposits will be fully funded and evidence of same will be made available to you.

4. *Commingling of funds:* We hereby agree that there will not be any advances or commingling of funds at any time.

5. *Gregory I, 031–32007; Gregory II, 031–32015; Gregory III, 031–55017; and Weequahic Towers, 031–00204:* We hereby agree to this payment schedule commencing May 1, 1971. Payments to be made on or before May 10, 1971 assuming all of the necessary documents will have been fully executed.

In support of his continued management, Mr. Padula stated that he would not draw any management fees "unless all monthly debt service and the conditions contained above are fully carried out," pointing out that another management organization would require a fee prior to debt service. Mr. Padula said in explanation of the defendant's disbursements to his related corporations

that of the $183,871 in advances remaining after subtracting the amounts constituting repayment to affiliates, all of that sum was "washed out" due to credits for initial rental fees, and paid or accrued management and insurance fees through September 30, 1970. Finally, Mr. Padula added that he required an additional clause permitting his projects to use "any excess funds over and above those required to pay the debt services agreed upon excluding Weequahic Park Plaza . . . to implement the Chapter 11 proceedings." (St. 34, J.E. 27).

After a subsequent meeting on May 27, 1971, Mr. Kalish prepared and signed two Provisional Work Out Arrangements for GP 1 and GP 2 which had a two-year term running from May 1971 to April 30, 1973, forwarding them to HUD's Newark Area Office for submission to Mr. Padula (St. 38). When he received these agreements, Mr. Padula called Mr. Kalish, stating the agreements were in error in that they had discussed a five-year term. I credit the testimony of Mr. Kalish who stated that, although the agreements called for a five-year payment plan to cure the delinquencies, they were initially to run for only two years; that although the delinquencies would not be cured by that time, HUD would then have had an opportunity to evaluate the defendant's progress under the agreements, and if dissatisfied, avail itself of its foreclosure remedy then and there. However, he said, Mr. Padula had thereafter called requesting a five-year term to assist him in funding the Plan of Arrangement in the bankruptcy court, stating that the bankruptcy court and creditors would not be satisfied with a two-year plan but wanted assurance that HUD would not foreclose before 1976. Mr. Padula also stated to Mr. Kalish that the success of the Plan in the bankruptcy court depended upon his ability to use moneys generated in excess of the payments required for the workouts to implement the Chapter XI. Mr. Padula requested permission to make the desired changes in the agreements and Mr. Kal-

ish assented. Mr. Padula then amended the agreements by extending them until April 30, 1976 and by adding the following to paragraph 4 of each agreement: "Any excess funds over and above those herein required may be used to implement the Chapter 11 proceedings". Mr. Padula then executed the agreements, dating them June 22, 1971, and returned them to Mr. Kalish by letter of June 21, 1971 (St. 39, J.E. 30, 31 and 32). Mr. Kalish received the amended agreements and accepted the changes (St. 40).

Thus, under the terms of the Provisional Work Out Arrangements, HUD agreed to take no action on defendant's default until April 30, 1976, provided that the defendant complied with the following conditions:

1. On or before the 10th of each month commencing May, 1971 and continuing through April, 1976 there shall be submitted:

A. A monthly payment during the first year equal to service charges, tax accruals, current interest plus 1/60th of the outstanding interest delinquency through April 30, 1971.

B. A monthly payment during the second year equal to [all items listed in 1A] plus a supplemental payment equivelent [sic] to the regular monthly amortization installment.

C. An accounting of all cash receipts and disbursements for the previous month on forms prescribed by the Assistant Secretary for Housing Management.

\* \* \* \* \* \*

4. It is further understood that there will be no commingling of funds among the projects or advances to affiliates and any violation of this provision will result in the immediate cancellation of the Agreement. Any excess funds over and above those herein required may be used to implement the Chapter 11 proceedings. (J.E. 31, 32)

## ACTS OF DEFAULT

In seeking foreclosure the Government claims that defendant has breached its obligations under the workout agreements. Among the acts claimed to constitute breach are defendant's alleged failure to pay appropriate tax accruals (i. e., service charge in lieu of taxes) commencing October 1972; its transfer of over $395,000 to the Chapter XI debtors in December 1972, claimed to constitute a prohibited advance to affiliates; numerous other advances to affiliates; a failure to file timely monthly reports with HUD; and, beginning in May 1973, the failure to make amortization payments as required by paragraph 1B of the workout agreements.

### A. Failure To Pay Tax Accruals (Service Charge In Lieu of Taxes)

On October 13, 1972 HUD made final payment to the City of Jersey City under a "Memorandum of Understanding" between Jersey City and Mr. Padula settling the amounts due from defendant for 1971 under the service charge in lieu of taxes. Although demands were thereafter made by HUD of defendant to reimburse it for the payment, and to increase monthly escrow payments for service charge accruals to cover the 1972 payments, defendant made no such payments. The defendant contends that the payments made by HUD were not due to Jersey City at the time they were paid by HUD, therefore rendering it a mere volunteer. Defendant also contends that HUD had sufficient escrow money on hand to cover the required payments, and thus did not have to advance HUD's funds therefor. For the issues thus raised to be properly understood, they must be placed in their appropriate factual background.

As previously noted, defendant entered agreements with Jersey City exempting its buildings from all municipal property taxes for 20 years upon the condition that it pay an annual service charge in lieu of taxes ($24,272.39 for GP 1 and $46,638.19 for GP 2, or 15 per-

cent of the annual gross shelter rent of each project, whichever was greater). Accordingly, each project was to pay, in equal quarterly installments, one-fourth of the minimum amount, and submit an accounting of the project's income and expenses within 60 days after the end of the calendar year. If the accounting required the payment of an additional amount (15 percent of the gross shelter rents), the payment was to accompany the accounting. Thus, under these agreements, the final payment of the annual service charge in lieu of taxes for 1971 was to be made no later than the beginning of March 1972.

On February 10, 1972 Mr. Padula wrote Jersey City regarding the 1971 service charge. He requested correction of what he said was an improper assessment and a current statement of Government payments toward the 1971 service charge. Attached were copies of previous bills indicating originals had been sent directly to HUD in Washington (J.E. 106).

On March 10, 1972 Mr. Padula explained, in a letter to Mr. Kalish, that the Comptroller in HUD (who was servicing the mortgages on GP 1 and 2) was escrowing too much money for the service charges on GP 1 and GP 3, and was $21,789 short on GP 2. He suggested paying the GP 2 shortage with the excess funds accumulated in the GP 3 escrow account which would still leave a $25,496 surplus in GP 3. He further suggested a return of those funds to GP 3 and proposed new monthly escrow figures (J.E. 107).

Mr. Padula then had a meeting on May 19, 1972 with Mr. Joseph F. Cahill, Director of Finance of Jersey City, concerning the specific amounts due on defendant's service charges, sewage and water bills. Mr. Padula's post-meeting letter to Mr. Cahill, dated May 22, 1972, indicated that the bills thereafter were to be sent directly to him for approval and he would then forward them to HUD with a recommendation for payment (J.E. 108). On June 8 and 9, 1972 Jersey City auditors visited the defend-

ant, and Mr. Padula then sent a letter to Mr. Kalish, dated June 15, 1972, informing him of the foregoing and stating that when Jersey City made its final determination of the amount due, he, Padula, would then recommend payment in full by HUD (J.E. 109).

 Finally, on August 7, 1972 Mr. Padula entered into the aforementioned "Memorandum of Understanding" with Jersey City settling the amount due for the 1971 service charge. This "Understanding" stated that the 1971 net service charge due from GP 1 was $71,072 and from GP 2 $98,075.40; that the 1971 service charge was "due and owing"; that the arrears outstanding for water and sewage charges was $53,273.-28; and that a resolution would be presented to the Jersey City Municipal Council abating taxes improperly assessed on one of defendant's parking lots (J.E. 38).

Defendant now would construe this "Understanding" as not requiring the 1971 charges to be paid until Council passage of the abating resolution. This interpretation is contrary to the words used by the parties. Nothing in this agreement conditions the payment of the 1971 service charge (and the outstanding arrearages for water and sewage charges as of July 26, 1972) upon the passage of a municipal resolution that would result in a credit of $2,539.61 and $2,480.34 for two payments made on an improper assessment.

 Even if the agreement were less clear, I would have to reject defendant's interpretation in view of the conduct of the parties both before and after execution thereof. First, the agreement calls for the payment of the water and sewage charges outstanding as of July 26, 1972, which are of course independent of the service charge. Second, the original agreement called for the service charge for 1971 to be payable in full by February 28, 1972. This fact was recognized by Mr. Padula in his letter of February 10, 1972 (J.E. 106). Throughout his discussions concerning the final amounts

due, Mr. Padula stated that as soon as the final amount was established, he would approve it and forward the billing to HUD recommending payment. This in fact was done. On August 29, 1972 Mr. Padula sent a copy of the "Memorandum of Understanding" to Mr. Kalish with a cover letter stating in reference to the settlement of Jersey City taxes:

> I am happy to report pursuant to many conferences held with the new Director of Finances [of Jersey City], Joseph F. Cahill, all of these matters have been resolved in writing. All of the outstanding bills have been procured and I recommend payment of the same *forthwith* by the government.
>
> Accordingly, I enclose herewith two duplicate copies of the agreement and the bill for your appropriate action with my *recommendation that you pay the same immediately to avoid cancellation on the part of the City of Jersey City* which would expunge the tax abatement agreements and leave us at the peril and mercy of a general taxpayer facing 30 to 40 per cent of our income in taxes. (St. 43, J.E. 37). [emphasis supplied]

Thus Mr. Padula specifically recommended that the amount due be paid by HUD "forthwith" and "immediately". Absent is a suggestion that payment should be withheld until the passage of a parking lot resolution by Jersey City. Nor did defendant subsequently object or claim that these funds were not due when the Government advanced these moneys and asked for reimbursement. Only after commencement of the instant action did defendant advance its strained interpretation, one I find contrary to law and against the weight of evidence evincing the intention of the parties, and accordingly I reject it.

A month after receiving Mr. Padula's urgent request to make payment, HUD, on September 29, 1972, advised him by letter that it was necessary to advance $78,000 of its own funds to pay the 1971 water, sewage, and service charges for

GP 2, that this money would have to be repaid, and, in addition, that during the next three months, the escrow payments would have to be increased to pay for the 1972 annual service charge (due by March 1, 1973), as estimated based on the actual payments for 1971. HUD further advised that although the escrow for GP 1 was sufficient to pay the 1971 charges, monthly escrow payments would likewise have to be increased for 1972 (St. 46, J.E. 40). On October 13, 1972 HUD paid Jersey City all the payments set forth in the "Memorandum of Understanding". (St. 47).

Mr. Padula was again advised, by letter of November 1, 1972 (J.E. 41), of the need to reimburse HUD for the aforesaid advances and to increase defendant's monthly payments to cover the 1972 service charge escrow. The letter concluded:

> You should receive the November 1, 1972 billings very soon. As we have previously indicated, our review of your monthly accountings shows that you have sizable amounts in cash and in certificates of deposit, so that you should have no difficulty in meeting these increased payments.
>
> Beginning in January of 1973, the amounts required for taxes will be based on estimates of amounts due for the calendar year 1973. Those estimates will be based on the actual amounts paid for 1971 and due for 1972.

The defendant indeed had accumulated $225,000 in certificates of deposit which it was holding. However, it obviously intended to preserve this fund intact for funding the Chapter XI Plan, and, as will appear, in little more than a month GP II's cash and certificates of deposit would be turned over to the debtors' estate. Thus, it failed to respond to HUD's demand for reimbursement for its advances, and did not increase its monthly payments to cover the increased escrow requirement. However, although HUD had believed that it had not received any payment whatever for November 1972, this belief was apparently the result of a bookkeeping error, as evidenced by the cancelled checks for that month. Defendant, however, does not contend that the November remittance included the demanded increase.

On December 13, 1972 HUD, reflecting increased urgency, sent Mr. Padula a telegram advising once again of the defendant's deficiencies, and demanding payment by December 31, 1972. The telegram further warned "your failure to remit checks by December 31, 1972 will terminate work-out arrangements and result in serious consequences" (J.E. 42). Notwithstanding the fact that the defendant at this time possessed substantial funds in the form of certificates of deposit to help satisfy its obligations to HUD, Mr. Padula replied by letter dated December 16, 1972, stating that it was impossible to comply with HUD's demand until the Chapter XI proceedings had been "disposed with." The letter also stated that:

> By letter dated April 24, 1971, we agreed to restore the escrow accounts which has been done and is represented in certificates of deposit totaling $275,000.00, which is being held by the Receiver and which will not be disturbed in the bankruptcy plan. (J.E. 43).

Amazingly, having thus stated that the escrow accounts were protected by the certificates of deposit, on the very next day (December 17, 1972) defendant transferred $253,000, including $225,000 in certificates of deposit, to the Chapter XI debtors' estate (St. 53, 78). These transfers were made to fund the Plan of Arrangement which was confirmed on December 18, 1972. In fact, the Chapter XI Receiver testified that, in the period from the confirmation of the Plan until the end of December, $395,898.37, or almost 100 percent of the defendant's funds, was transferred to the debtors' estate to fund the Plan.

Unaware of the transfer, on December 22, 1972 HUD responded by telegram to Mr. Padula's letter of December 16:

> Your tax escrow accounts depleted by payments due Jersey City per your

agreement. HUD advanced approximately $80,000 cash. Other material in your letter irrelevant. Amounts stated in our telegram 12/15/72 are due under terms of work-out arrangements and must be paid before 12/31/72. (J.E. 44)

An additional telegram was sent on January 18, 1973 stating if the amounts due were not received by January 31, 1973, without further notice foreclosure proceedings would be instituted (J.E. 46). Mr. Padula responded by letter dated January 24, 1973 asking that foreclosure proceedings be held in abeyance in that, *inter alia,* defendant had "lived up to all of the terms and conditions [of the workout agreements] except the matter of the tax escrows which I can adjust by April 30, 1973" (J.E. 47). No checks were ever forwarded by the defendant to cover the delinquencies, but instead it continued to remit checks of $37,829.13 for GP 1 and $45,915.62 for GP 2 from January to June 1973 (J.E. 62, 63).

█ Defendant argues that in view of the fact HUD extended defendant's exemption from making amortization payments, HUD knew defendant lacked funds to meet the increased escrow requirements and accordingly the agency acted unreasonably in refusing to entertain any alternative plan to extend further the period of time for making payments. This is a specious contention, considering the large sums of cash defendant accumulated and then transferred to the Chapter XI debtors in defiance of HUD's repeated demands. Defendant's failure to satisfy its obligations under the workout agreements simply cannot be justified upon the grounds of insufficient revenues.

█ Defendant doggedly argues next that HUD was not obligated to make the payments to Jersey City to protect its security because under New Jersey law, although a specific statute creates a prior municipal lien for property taxes, N.J.S.A. 54:5-1 et seq., no statute creates such a lien for a service charge in lieu of taxes. Although defendant's nar-

row construction of the New Jersey Tax Sale Act, N.J.S.A. 54:5-4, is very questionable, especially in view of N.J.S.A. 54:5-3, which provides for liberal construction of the Act, it is unnecessary to construe the statute. The fact is that HUD properly acted in making the payments to Jersey City under its agreement with defendant.

Paragraphs 3 and 5 of both mortgages covering defendant's property (J.E. 5, 11) provide as follows:

3. That the Mortgagor will pay all ground rents, if any, taxes, assessments, water rates and other governmental or municipal charges or impositions to the extent provision therefor has not been made by monthly payments as hereinbefore provided before the same become delinquent or subject to interest or penalties, *and in default thereof the Mortgagee may pay the same. All such sums so paid by the Mortgagee* plus any sums which the mortgagee had advanced to pay mortgage insurance premiums or fire and other hazard insurance premiums not provided for by monthly payments hereunder, shall be added to the principal of this mortgage, shall bear interest at 5% per centum from the date of the advance and *shall be due and payable to the Mortgagee upon demand.*

\* \* \* \* \* \*

5. That the Mortgagee may, at its option, advance and pay any sum of money *that in its judgment may be necessary* to perfect title to the mortgaged premises in the Mortgagor, so as to make this a first lien upon the premises above described, or to preserve the security intended to be given by this mortgage, and all such sums shall be added to the amount of said note and secured by these presents, payable on demand. [emphasis supplied]

Under the terms of paragraph 3, HUD was certainly justified in paying the service charges to Jersey City, especially in view of Mr. Padula's "recommenda-

tion." Even if these charges were not finally due at the time paid, there was at least a sufficient question to cause HUD, in its judgment, to reasonably believe that such moneys should be paid, in reliance upon the terms of paragraph 5. Defendant's sole argument under the agreement is that the charges were not due when paid. As I previously stated, I reject defendant's interpretation of the "Memorandum of Understanding" and find that the charges were in fact due and owing when paid by HUD.

■ Additionally, I find that, even ignoring HUD's payment of the 1971 service charge, defendant was obligated under paragraph 1A of the workout agreements to make, and failed to make, monthly payments that included service charge accurals. Beginning in October 1972 defendant failed to submit sufficient payments to cover the accruals for the 1972 service charge in lieu of taxes. Since the purpose of establishing the escrow account was to periodically accumulate sufficient funds to enable HUD to pay service charges when due, it is no defense to defendant's failure to make proper escrow payments for 1972 to say that the final adjustments of these taxes is not due until February 28, 1973.

■ Finally, defendant now claims that HUD had sufficient moneys in its possession to pay the 1971 service charges due to Jersey City for GP 1 and GP 2 out of the escrow surplus for GP 3. However, throughout the period beginning when Mr. Padula was advised by HUD of the amount of Government funds it had to advance to pay the 1971 charges, and continuing throughout HUD's demands for repayment and threats of foreclosure, Mr. Padula had never responded by advising of a sufficient surplus in GP 3's escrow account. Moreover, it is of incidental interest that defendant has not offered any evidence to establish that at the time HUD advanced its own moneys there was in fact a sufficient surplus in the escrow account of GP 3 to cover the amounts due.

What is in the record is Mr. Padula's letter of February 10, 1972 (J.E. 107) stating the respective positions of the escrow accounts for GP 1, 2 and 3, with his computation of the 1971 charges, and illustrating a surplus in GP 3 to cover the deficit in the escrow account of GP 2 for the service charge in lieu of taxes. But, as admitted by defendant's accountant, this letter made no reference to water and sewage charges which were also paid by HUD and charged against the tax escrow accounts (T. 417–18). Thus defendant has not even shown that the escrow accounts as of February 10, 1972 were sufficient to also cover the water and sewage charges. More importantly, as stated, the evidence does not establish defendant's contention that the GP 3 escrow account was sufficient to cover HUD's advances in September and October 1972.[7]

Accordingly, for the reasons stated, I find that the defendant has breached the escrow provisions of the workout agreements and is in default under the mortgages.

### B. December 1972 Transfers To Chapter XI Debtors

The Government also claims defendant has defaulted on its mortgages by the conceded advancing of $395,898.37 to the Chapter XI debtors, in December 1972, in violation of paragraph 4 of the workout agreement [7a] which prohibits commingling of funds among the projects and advances to affiliates, but permits "[a]ny excess funds over and above those herein required" to be used to im-

---

7. Since the evidence does not establish defendant's factual contention it is not necessary for this court to determine as a matter of law whether the existence of a GP 3 escrow surplus sufficient to cover the net escrow deficit of GP 1 and GP 2 would entitle defendant to resist default on its agreements relying upon a surplus of another corporation.

7a. Since the workout agreements for both GP 1 and 2 are identical, they are referred to interchangeably in the singular and plural.

plement the Chapter XI proceedings. Defendant attempts to justify these transfers on two grounds: First, it is claimed that this sum partially represents management fees owed to Arthur H. Padula, a debtor; and second, the remainder is, under workout agreements, "excess funds" permitted to be used in the Chapter XI proceedings. With respect to the management fees, it is argued that Mr. Padula was owed such fees as had accrued but were unpaid during the Receiver's administration. Thus it is contended that when Leo Neiwirth, Esq., the Receiver, assumed Mr. Padula's management contract with the various buildings, including GP 1 and GP 2, as an asset of the Chapter XI debtors, he did not take all management fees owed Mr. Padula under the contract. Mr. Padula now claims he was justified in withdrawing these "accrued but unpaid" fees when the Receiver's administration terminated and the debtors were revested with their assets. The parties have stipulated that during the Receiver's term, from September 18, 1970 until December 18, 1972, the Receiver claims to have deducted management fees of $85,005 from GP 1 and $86,428 from GP 2 (J.E. 56); however, defendant's accountant, from an examination of defendant's books and records, states that only $72,476 and $77,188, respectively, were deducted from GP 1 and 2 (St. 66). The parties have not assisted the court in reconciling these differences. Assuming defendant's figures to be correct, however, an additional $66,896 is claimed by defendant to have been owing from it to Mr. Padula (T. 409–15).

The Government disputes the "management fee" theory. It argues that Mr. Padula cannot, after the Chapter XI, disavow or separate himself from the acts of his own Chapter XI Receiver performed during the period of the Receiver's administration. Mr. Padula's claims for additional fees, it states, should have been made in and to the bankruptcy court. The Receiver, it is

noted, testified that at the confirmation of the Plan he verified that all management fees properly due to Mr. Padula for the period of his administration had been deducted and paid to the Chapter XI estate (T. 435).

The entire discussion of management fees, however, is inconsequential on the issue of default, even accepting defendant's theory in its entirety, since defendant must also justify the remaining $339,000 transferred from defendant to the Chapter XI from December 17, 1972 to December 31, 1972. Defendant, continuing to speak through Mr. Padula, its principal, contends that these moneys are "excess funds" which were permitted, under the workout agreement, to be used to implement the Chapter XI proceeding.

■ At trial defendant labored to establish a special meaning for the words "excess funds" as they appear in paragraph 4 of the workout agreement. Sought was Mr. Padula's interpretation of these words, as a party to the agreement, as well as that of defendant's accountant, as an expert. Since defendant did not establish that these words, as used by the parties, were given a specialized usage requiring expert aid to determine their meaning, and since the accountant did not purport to render an accounting interpretation of these words, but only offered his own interpretation, resting upon their context within the agreement, I barred his testimony.[8] *Compare* Carter Oil Co. v. McCasland, 190 F.2d 887, 891 (10th Cir. 1951). *See generally* 7 Wigmore, Evidence § 1955, at 85–86 (3d Ed. 1940).

The workout agreement does not simply refer to the words "excess funds", but rather to excess funds over and above those funds needed to satisfy defendant's obligations under the workout agreement. Thus, under the agreement, the defendant could use GP II moneys to implement the Chapter XI proceedings, provided these moneys were not needed

---

8. I did however permit an offer of proof to be made in question and answer form, to enable defendant to protect its record for appellate review.

to satisfy existing obligations to the Government under the workout agreement. I find this meaning of this clause in the agreement to be quite clear, requiring no parol evidence to illumine its meaning, and to be the only one of which it is susceptible.

■ On the last day of trial, counsel for defendant offered on argument a new and unique interpretation of the "excess funds" clause: the clause incorporated a periodic concept; and periodically, without requiring any segregation among the assets of defendant, certain funds became "excess" and could be later applied to the Chapter XI notwithstanding the existence, at the time of such application, of outstanding obligations to HUD under the workout agreement. He suggested that the funds that had accumulated prior to the execution of the workout agreement, as a result of defendant's failure to make any payments to the Government on its mortgages from September 1970 to April 1971, became "excess funds" upon the execution of the agreements; and, for the first time, without briefing, argued that at the end of defendant's subsequent fiscal years, i. e., September 30, 1971 and September 30, 1972, additional "excess funds" were created (T. 375–76, 381–82). Analytically, as I shall show, this theory is full of holes. Moreover, it is unsupported by any testimony I can credit. It is evident to me that no such meaning was contemplated by the parties to the agreements (T. 385–89). As noted, too, there had been no special segregation of funds or establishment of an appropriate account on the books of the

defendant regarding such excess funds. Instead, these funds were maintained partially in certificates of deposit, and partially in the defendant's general cash account, without any special designation (T. 383). Most significantly, this interpretation is belied by a plain common sense reading of the clause in the agreements: the determination of whether excess funds exist can only be made at the time a transfer to the Chapter XI proceedings is to be made, here, December 18, 1972. Only then can it be determined whether all of defendant's obligations to HUD under the workout have been satisfied, and if excess funds exist.[9]

At the time the workout agreement was executed, defendant, through Mr. Padula, intended to use the funds accumulated as a result of non-payment to HUD as a source of the moneys for implementing the Chapter XI Plan. In the agreement HUD did not demand repayment from these funds, in a lump sum, of the amounts past due. However, what HUD did demand, was that before these moneys could be transferred to the Chapter XI, the defendant be current on its obligations under the agreement. If the transfer had been made at the time the agreement was executed, or on September 30, 1971, assuming defendant was current in its obligations, it would have been a proper transfer under the agreement. Instead, the transfer was made in December 1972, at a time when, as I have previously found, defendant has been in default on its obligations with respect to making proper payments for the 1972 tax accruals, and repaying HUD for its advances on the 1971 serv-

9. This plain meaning interpretation is supported by the testimony of the Receiver who was overseeing defendant during the negotiation of the workout agreement, and who actually performed the December 1972 transfers believing himself in compliance with the workout agreements. He stated that Mr. Padula had not shown him HUD's letters demanding increased payments for the 1972 tax accruals and demanding repayment for the 1971 service charges out of the moneys that had been accumulated in certificates of deposit. If he had been aware of these demands he would have verified the amounts

with Mr. Padula, and if accurate, he would have paid HUD. He stated he did in fact make an analysis of all obligations outstanding at the time of the confirmation and paid all bills presented to him before the transfers in question. He did not believe there was anything special about the funds accumulated whereby they could not be used to pay expenses that were due. After paying every outstanding obligation that he knew of, he considered what was left as excess funds that could be transferred to the debtors. (T. 431–34, 441–44, 446–48). *See infra* for discussion of this testimony.

ice charge. Thus the December 1972 transfers were not sanctioned by the last sentence in paragraph 4 of the workout agreement.

■ Next I must determine whether the December 1972 transfer was an improper "advance" to an affiliate under the first sentence in paragraph 4 of the workout agreement. It is interesting to note that Mr. Padula at trial refused to give any characterization of the transfer other than to call it the "use of excess funds" (e. g. T. 291, 293, 299). He denied that it was a loan, an advance, an intercompany exchange (T. 293), or a dividend to GP II's stockholder, Mid-Center (T. 298). Although I regard it as of no weight in this proceeding, the Receiver had testified before me in another proceeding that he considered the transfer as a loan from the defendant. Defendant did not at the time of trial (February 1974) have prepared financial statements for the year ending September 30, 1973. However, GP 3 financials were available; and its contribution to the December 1972 transfers was listed as "Advance to the Chapter XI Receiver" accompanied by a footnote stating that although the amounts transferred were listed as a current asset, collection cannot be presently evaluated. Defendant did not contend that its transfer would not be similarly treated. I do, therefore, find the transfer in question to be an advance to an affiliate, within the proscription of the workout agreement, and thus another act of default since not justified under the "ex-cess funds" clause of paragraph 4 of the agreement.

■ Defendant, through Mr. Padula, alternatively claims authority to transfer to the debtors at least the funds accumulated prior to the execution of the workout agreements, based on an agreement in existence prior to the workout agreements. If in fact the transfers had occurred prior to the execution of the workout agreements, such transfers would have been governed by the regulatory agreements which prohibit distributions of assets or income of the project except from "surplus cash", as defined in the agreements [10] (J.E. 8, 15). I find that to the extent the workout agreements place different limitations upon such a transfer they would control a transfer made subsequent to its execution and during its term. *See e. g.,* United States v. Gilman, 360 F.Supp. 828 (D.Md.1973). It is noted, however, that even under the regulatory agreements, such a transfer would not be considered as having been made from "surplus cash." It is undisputed that at no time was there a complete segregation of all tenant security deposits held; and, as I have held, at the time of the transfers defendant was not current in its obligations to HUD.[11]

■ Defendant next contends that a default should not be declared because the aforesaid transfers were made by, or by order of, the Receiver; therefore the defendant could not prevent them. By this argument defendant implies the transfers were objected to by it. The

---

10. 13. As used in this Agreement the term:

\* \* \* \* \*

(g) 'Surplus cash' means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

(ii) All amounts required to be deposited in the Reserve Fund for Replacement;

(iii) All obligations of the Project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held;

11. For discussion of the "surplus cash" provisions of identical HUD regulatory agreements *see* United States v. Gilman, 360 F. Supp. 828 (D.Md.1973); United States v. Thompson, 272 F.Supp. 774 (E.D.Ark.1967), aff'd., 408 F.2d 1075 (8th Cir. 1969); United States v. Preston Tower, Ltd., Civ.No. 3–6105–D (N.D.Tex. October 19, 1973) (unpublished).

facts compel a conclusion to the contrary.

Mr. Padula testified that it was not he, but Mr. Neiwirth, who originally made the decision to fund the Chapter XI proceedings with the defendant's funds, and that this decision was made in February 1971, when he wrote a letter seeking the negotiation of the workout agreements. He stated that Neiwirth "was the Receiver and he was the lawyer and this is what he was going to do" (T. 218). He also testified that he objected to the transfer of GP II funds by Neiwirth to the Chapter XI estate; an estate in which Mr. Padula individually was a debtor and the chief personal beneficiary (T. 195–96). Upon further examination, however, he contradicted his previous testimony and admitted he approved Mr. Neiwirth's transfer of the funds and that it was in his interest to get the Chapter XI plan confirmed (T. 198–202). He continued, however, to put at Mr. Neiwirth's door the responsibility for the key decisions in making the transfers. In this connection, he claimed that in November and December of 1972, prior to the transfers, when letters and a telegram from HUD demanding payments due were addressed to him, he brought them to Mr. Neiwirth's attention. He and Mr. Neiwirth, he said, "discussed every aspect of this" (T. 206).

In view of the significant role played by Mr. Neiwirth, according to Mr. Padula, it was inconceivable to me that defendant would not call him as a witness. As defendant's case moved along at trial, I inquired of counsel whether Mr. Neiwirth would be called. Counsel responded in the negative. The court then called Mr. Neiwirth as its witness, over defendant's objection. *See* United States v. Wilson, 447 F.2d 1, 8 (9th Cir. 1971), cert. denied, Polk v. United States, 404 U.S. 1053, 92 S.Ct. 723, 30 L.Ed.2d 742 (1972); Estrella-Ortega v. United States, 423 F.2d 509 (9th Cir. 1970); United States v. Brandt, 196 F. 2d 653, 655 (2d Cir. 1952) (Clark, J.).

Mr. Neiwirth's testimony, it developed, was in direct conflict with Mr. Padula's on certain significant issues. With respect to the original conception of funding the Chapter XI with GP II funds, as well as the actual transfers, Mr. Padula had endeavored to create the impression that Mr. Neiwirth, as the Receiver, and as an attorney, was the driving force. As to this, and as to the other aspects covered by the testimony of both, I accept and credit Mr. Neiwirth's testimony and reject Mr. Padula's. It was Mr. Neiwirth's recollection that the original concept of using GP II funds for the Chapter XI was Mr. Padula's idea. He first discussed it with Mr. Padula at the time the workout agreement was negotiated. Mr. Padula had suggested to him that since they were to have a workout agreement, it would be a good idea to insert a paragraph allowing the use of the excess funds for the Chapter XI plan. Mr. Neiwirth had no objection if the Government did not (T. 426). His February 23, 1971 letter to HUD (J.E. 24), which, according to Mr. Padula, was drafted at the time that Mr. Neiwirth, as Receiver, told Mr. Padula "what he was going to do," was in fact prepared by Mr. Padula himself and signed by Mr. Neiwirth after a few changes (T. 439–40). Mr. Neiwirth's testimony, rejecting the impression sought to be created by Mr. Padula that Mr. Neiwirth was the moving force, is supported by Mr. Padula's own initial testimony regarding the negotiation of the workout agreement. Mr. Padula stated he had negotiations beginning in November 1970 and that it was he who had the numerous direct negotiations with HUD. In addition, almost all correspondence in evidence concerning the negotiation of the workout agreement with HUD is directed to or initiated by Arthur H. Padula.

Moreover, with respect to the actual transfer of funds, I accept Mr. Neiwirth's testimony that the decision to transfer funds from GP II was jointly

made by Mr. Padula and himself a few weeks before the date of the confirmation (T. 425). Most significantly, Mr. Neiwirth stated flatly and unequivocally that Mr. Padula had never shown him the HUD letters and telegram demanding payment for the 1971 service charge and 1972 accruals. Specifically, he denied being shown the HUD letter to Mr. Padula of November 1, 1972 (J.E. 41) and the HUD telegram to Mr. Padula of December 13, 1972 (J.E. 42). Nor was he shown the HUD telegram to Mr. Padula of December 22, 1972 (J.E. 44), which was at a time when, although the Plan had been already confirmed and the debtors technically revested with their assets, Mr. Neiwirth had not completed all transfers of funds from GP II (T. 431). He first saw these exhibits one month prior to trial, shown them by Government counsel (T. 431–33). It is clear and I so find that, if he had been given the information contained in the letter of November 1 and the telegram of December 13, a red flag would have been raised as to the propriety of the transfers. He would, I find, have checked with Mr. Padula to confirm whether HUD was owed the amounts claimed and, if so, he would have paid those amounts out of the funds that GP II had accumulated. If there had been a dispute over what was due to HUD, he would have asked Mr. Padula to resolve the dispute, as he had done in the past, and then have made payment of what was owing (T. 432–34, 444).

Since Mr. Neiwirth's testimony is in direct conflict with Mr. Padula's assertion that these letters had been shown to Mr. Neiwirth, and that they had discussed every detail thereof, I am impelled to make a specific credibility determination in addition to the aforesaid general determination. I find I must accept the testimony of Mr. Neiwirth, the Receiver, and reject that of Mr. Padula, the chief individual beneficiary in funding the Chapter XI plan, and in resisting foreclosure. This finding is based on the demeanor of the witnesses as I carefully observed them testify; my impression that Mr. Neiwirth answered directly and unevasively, as against the evasiveness of Mr. Padula; their relative interests in the litigation; and reasonableness of their testimony in light of the entire record before me.

Mr. Padula's failure to inform Mr. Neiwirth of HUD's demands for payment has significant implications bearing not only upon Mr. Padula's good faith and credibility, but also, substantively, upon his understanding of the workout agreement and defendant's obligations under it. Based on the record before me, the inference is inescapable that Mr. Padula intentionally withheld this information from Mr. Neiwirth because he feared that disclosure would adversely affect Mr. Neiwirth's determination of what were "excess funds," thereby reducing the amount available for transfer and jeopardizing the funding of the Chapter XI Plan. Viewed in this light, I must characterize his responses to HUD's demands for payment as intentionally misleading, with the similar objective of forestalling any HUD action that would jeopardize the confirmation of the Plan. Indeed, the overall conduct of defendant's president and beneficial owner also places in proper perspective defendant's equitable defenses which seek to resist foreclosure based upon, no less, the actions of HUD.

As previously mentioned, in response to HUD's November 1, 1972 letter demanding payment for the 1971 service charges advanced, and for increased 1972 tax escrows out of the "sizable amounts in cash and in certificates of deposit" that defendant had accumulated (J.E. 41), and in response to HUD's December 13, 1972 telegram demanding payment by December 31, 1972 under threat of termination of the workout agreement (J.E. 42), Mr. Padula had replied on December 16, 1972 that defendant could not comply with the demand until the Chapter XI proceedings had been "disposed with" (J.E. 43). He did not respond that the "sizable amounts in cash" and certificates of deposit were not available for payment to HUD be-

cause he considered them "excess funds" under the workout agreement (the position he now takes) and intended to transfer them to the Chapter XI debtors, but instead told HUD the contrary: He stated that he had previously agreed to restore the escrow accounts, that this had been done and was represented by $275,000 in certificates of deposit. He further stated that these funds would "not be disturbed in the bankruptcy plan" (*Id.*). Thus at the very time he was preparing to cooperate with Mr. Neiwirth in the massive transfer of GP II funds to the debtors' estate, thus putting them out of the reach of HUD, GP II's secured creditor, he was assuring HUD that those funds would in fact be available to it, and would "not be disturbed" by the Chapter XI proceedings.[12] Not only did he fail to give HUD such notice of his intended actions so that HUD might take appropriate steps to protect its security, but he intentionally misled HUD so as to prevent such action. Mr. Padula knew his last chance to avoid complete financial disaster was to obtain confirmation and to fund the Chapter XI Plan. To obtain this objective he was willing and ready to go to any lengths.

Mr. Padula claims that he had no obligation under the workout agreement to notify HUD of defendant's intended transfers, that the transfer were actually made by Mr. Neiwirth, and that Mr. Padula was acting under an honestly held belief that defendant had a right to transfer the funds in question. I find that regardless of who signed the checks and actually performed the transfers, Mr. Padula, acting for defendant, was the moving force behind them. Moreover, I reject Mr. Padula's contention that he acted under an honest belief that the defendant was entitled to make these transfers. Based upon defendant's

response to HUD's demands for payment out of its accumulated funds, whereby it assured HUD that the certificates of deposit would be available to HUD; Mr. Padula's concealment (acting for defendant) of HUD's demands from Mr. Neiwirth; defendant's knowledge, again through Mr. Padula, of the massive transfers and other actions, I am led to the inescapable conclusion that defendant's actions, as perpetrated by Mr. Padula on its behalf, constituted a fraud upon the Secretary of HUD. The transfer of over $395,000 of GP II's funds to the Chapter XI debtors, based upon these facts, is far more serious a wrong than a mere breach of the workout agreement. Not only were the Government demands for payment refused, but by this act Padula stripped the defendant of almost all cash and denied it the ability to pay its outstanding obligations to HUD, all in order to satisfy his own personal creditors, who were parties to the Chapter XI proceedings, at the expense of HUD. Thus he withdrew money rightfully belonging to HUD and used it for his own personal benefit.

Meanwhile, HUD continued in the dark and was completely unaware of Mr. Padula's activities. On December 22, 1972, after confirmation of the Plan and commencement of the transfer of funds, but before these transfers were completed at the end of December, HUD once again by telegram demanded payment by December 31, 1972, stating that all of the material in Mr. Padula's December 16, 1972 letter was irrelevant (J.E. 44). This drew a response, dated December 27, 1972, on Mr. Padula's stationery, written by an assistant, stating that Mr. Padula would be on vacation until January 10, 1973 (J.E. 45). HUD again demanded payment by telegram dated January 18, 1973, threatening foreclosure if payments were not received by January

12. It is also noted that at this same time, on December 18, 1972, Mr. Padula further depleted the assets of GP II by waiving for GP II the initial payment it was to receive under the Chapter XI plan. GP II had a claim of $185,401.54 for moneys owed it by the debtors. The plan only called for a payment of 10 percent of this amount, of which the initial 5 percent, the only money that was to be initially paid, was waived (J.E. 89).

31, 1973 (J.E. 46). Mr. Padula replied most misleadingly by letter of January 24, 1973. He did not inform HUD that GP II's funds had been transferred to the debtors' estate. He did state that he had deposited $664,000 with the bankruptcy court and that the Judge ordered the Receiver to hold all funds in the custody of the court, "including funds due the U.S. Government . . . ." He further stated that disbursements of these funds would be illegal but that they were being held by the Receiver and earning interest (J.E. 47). The funds due the United States, however, here in fact refer to Padula tax obligations and not moneys due HUD. I find this letter intentionally confusing, an attempt to create the impression that somehow the money due HUD could not be paid as a result of a court order, but that it was accumulating interest and would be eventually available to HUD, although HUD had no claims in the Chapter XI and was not a general creditor of any of the debtors. Despite Mr. Padula's further obfuscating efforts, however, HUD became aware from an independent source of transfers in excess of $200,000 of GP II funds.[13] In HUD's letter of February 6, 1973 it showed recognition of the true facts and responded to Mr. Padula's earlier claim that his inability to raise rents as a result of the guidelines of the Price Commission should be considered in his inability to comply with the workout agreement stating:

> We do not understand your statements concerning the relationship between rental increases and payments under the Provisional Work Out Arrangements. If you had received additional rental income you would not have been required to make any additional payments under the Work Out Arrangements. The reason you did not comply with the provisions of the Work Out Arrangements is that the excess net income has been deposited with

the Receiver for payment to unsecured creditors. The amounts deposited with the Receiver are more than sufficient to have paid the back taxes. If you had received additional amounts of rental income the amount now held by the Receiver would be greater; however, the amount applied on your loans would have been the same. (J. E. 48)

The mortgages on GP 1 and 2 were then referred to HUD general counsel for foreclosure on February 16, 1973.

■ Nevertheless, on April 18, 1973 Mr. Padula requested a further deferral of one year of the obligation to make amortization payments until May 1, 1974 (J.E. 49). This request was denied by letter of May 1, 1973, which informed Mr. Padula of HUD's February 16, 1973 action (J.E. 50). Thereafter, after receiving further requests for forebearance and proposals of new plans (J.E. 53, 116), HUD replied by letter of June 18, 1973, rejecting Mr. Padula's proposals, labeling such proposals unreasonable. It was stated that it was unreasonable to have HUD advance payments for past service charges, and water and sewage charges, and have the Receiver hold hundreds of thousands of dollars of project income to be used to pay the debtors' unsecured creditors. This letter reflects HUD's understanding of Mr. Padula's past activity, and his further proposals to use HUD funds to his and defendant's personal advantage, to the detriment of the United States. Thus HUD stated:

> . . . Most of the debts which are to be paid [in the Chapter XI] are debts of corporations and individuals other than the above projects. So far as we are able to ascertain, most, if not all, of the funds required to make settlement with the creditors will come from the income from the projects.
>
> \* \* \* \* \* \*

13. It is not until Mr. Neiwirth testified at trial that the Government, as well as the Court, became aware of the fact that the exact amount of the transfers from GP II was in excess of $395,000.

Your December accountings showed that in addition to taking all of the cash which had accumulated in the projects prior to execution of the Work-Out Agreements in 1971 (when no payments were being made to HUD) the Receiver took all of the cash on hand, including the tenants security deposits and, we understand, the management fees, for payment to the unsecured creditors—creditors of Arthur H. Padula Construction Company, Mid-Center Redevelopment Corp. and Arthur H. Padula. In other words, all available cash in project accounts was taken by the Receiver to get the $600,000 needed to settle those debts. At the same time, HUD is requested to advance funds to pay service charges and sewer and water charges.

To the extent that funds, which are due under the mortgage, are used to pay other debts of the owners of the project, HUD is financing the owners. We can see no justification for HUD to, in effect, lend the owners money, at a very reasonable rate, for a period of seven years to finance other activities. (J.E. 54).

Against this background the United States now seeks foreclosure. I cannot conceive of a set of circumstances where this remedy would be more justified.

C. *Other Advances To Affiliates*

In addition to the transfers made in December 1972, I find that defendant made subsequent advances to affiliates in violation of paragraph 4 of the workout agreement.

HUD's claims of defendant's improper advances date back to January 1971. By letter dated January 26, 1971, defendant through Mr. Padula was advised of ad-

vances in excess of $350,000 to affiliated corporations that were asserted by HUD to have been made from other than surplus cash in violation of the regulatory agreement (J.E. 23).[14] Again, an explanation of advances of $359,705 as of September 30, 1970 was sought by HUD's letter of April 16, 1971 (J.E. 26). By reply dated April 27, 1971, Mr. Padula explained that the "net" advances "wash out" after appropriate adjustments for management fees and other items. The claims for management fees, however, appear to be contradicted by defendant's financial statement for the fiscal year ending September 30, 1970 which was certified to be correct by Arthur H. Padula. Note 6 of that statement confirms that full management fees due were not collected or accrued, but states that the remaining balance of these fees has been waived by the managing agent (J.E. 95d). Moreover, on February 25, 1971, defendant filed a proof of claim of $185,401.54 in the Chapter XI proceeding for moneys owed defendant by the Chapter XI debtors, thus further controverting Mr. Padula's assertions that the advances had "washed out." (St. 68, J.E. 88).

In any event, the workout agreement was then entered into whereby the Government agreed to forego foreclosure, with one of the stated conditions being that no further advances to affiliates occur. However, from the period of January through October 1973, defendant repeatedly breached this provision. The buildings were managed, along with the other Padula buildings, as if paragraph 4 of the agreement did not exist, and as if there were no corporate distinctions between them, to the detriment of each entity's independent creditors.[15] The parties have stipulated

---

14. For a discussion of the surplus cash provision in the regulatory agreement *see* pp. 335–336 *supra.*

15. It is noted that the activity of making intercompany advances prohibited by the workout agreements is not an activity solely limited to defendant, but has also been en-

gaged in by other Padula enterprises. In my opinion appointing a receiver *pendente lite* for GP 3 I found that advances between and among the various Padula entities, including GP 3, were commonplace transactions. Then before me was a letter to Mr. Padula from the accountant for GP 1, GP 2, and 3, who testified herein. That letter,

the amount of advances for the period in question (St. 73). For GP 1, $15,000 was transferred to affiliated buildings. Of this $15,000, $14,000 was designated as loans,[16] with $1,000 as an "intercompany exchange." For GP 2 a total of $40,777 was transferred to affiliates. Of this sum $5,000 was designated as loans, $10,000 as an intercompany exchange and loan transfer, and the remainder as intercompany exchanges. I find all of these transfers to be advances prohibited by the workout agreement.[17] It is noted that these transfers all occurred after May 1, 1973, a period in which Padula claims he did not have sufficient revenues to commence making amortization payments for GP 1 and 2, and a period subsequent to HUD's demands for repayment of its advances for the service charges due. I find these loans and intercompany exchanges violative of the workout agreements regardless of any repayments made by the affiliates. The workout agreements do not proscribe only net diversions but seek to stop this type of intercompany activity altogether.[18]

For GP 1, during the same period $9,000 was transferred from GP 3 to GP 1 and designated as repayment of loans. It is noted, however, that these repayments do not correspond to any of the loans made by GP 1 during the period in question, and therefore must relate to loans made during an earlier period. Thus, it is clear that this intercompany loan activity by GP 1 is not only peculiar to the 1973 period but had also preceded it. It is also noted that, after considering the repayments, there still exists a net diversion of GP 1 funds to its affiliates.

For GP 2, there was a repayment in June 1973 of $3,500 of loans made May 1973. However, the initial making of these loans is proscribed by the agreements. Moreover, even after considering these loans, there is a net diversion of $37,277 of GP 2 funds to its affiliates, all subsequent to the period during which, Mr. Padula claims, defendant did not have sufficient revenues to make amortization payments.

Moreover, in addition to these loans and intercompany exchanges, from the period of January to October 1973, Mr. Padula withdrew in excess of $88,000 in management fees for the two buildings (GP 1 and 2), which sum substantially exceeded the 5 percent of gross rentals to which he claimed to be entitled under his management contracts. It can not be successfully contended that these excess withdrawals were also for accrued but unpaid management fees, as these

dated December 26, 1973, illustrated a blatant disregard for the workout agreements' proscription on advances to the affiliated companies:

> as was done in the past, sums of moneys were transferred between various companies depending on each respective companies [sic] cash position at that time.

*See* United States v. Gregory Park Section III, Civ.No. 1734–73 (D.N.J. February 22, 1974). In that proceeding, as here, attempts had been made to characterize such advances as intercompany exchanges that wash each other out. In this regard, it was noted that on GP 3's financial statement for the fiscal year ending September 30, 1973 (J.E. 122), the asset representing advances to affiliated companies is qualified, stating that the "amount due from related companies cannot be evaluated as to collection."

16. Of this $14,000, $2,000 went to Carmel Tower and Zion Tower, which although not owned by Mr. Padula, were constructed by AHPCC and are managed by Arthur H. Padula Management Co. (St. 110).

17. It is noted that Mr. Padula in his testimony admitted that a portion of the loans herein question represented advances to an affiliated company (T. 288–89).

18. In United States v. Preston Tower, Ltd., Civ.No. 3–6105–D (N.D.Tex. October 18, 1973) (unpublished) the court found transfers by the defendant to its limited partner, while defendant was in default on its mortgage, violative of a regulatory agreement identical to those in the instant action, notwithstanding that that partner and its owners had previously advanced defendant over $2 million to meet its operating expenses and mortgage payments. In the matter *sub judice*, it is clear that at least the loans were not repayments for prior advances.

claimed accrued and owing fees were all exhausted in the December 1972 transfers to the Chapter XI debtors.

### D. *Amortization Payments due May 1973*

The Government further contends that paragraph 1B of the workout agreement was breached in that defendant failed to submit payments for amortization of principal beginning in May 1973. It is not in dispute that amortization payments were not made commencing in May 1973. Indeed, in the proceedings before me for the appointment of a receiver *pendente lite* for defendant, defendant's counsel readily conceded this. What was argued then, however, was that such default was justified by HUD's failure to approve sufficient rent increases to enable defendant to make the increased payments.[19] This claim of justification is still alleged, and will be subsequently discussed as an affirmative defense. However, upon the trial of this action an additional defense is now raised: it is contended that the agreements do not call for amortization payments to commence in May 1973, but that the commencement of these payments would be negotiated in April of 1973 and the commencement thereof would depend upon defendant's ability to pay.

The workout agreements provide in pertinent part as follows:

The undersigned mortgagor requests the Assistant Secretary for Housing Management to hold the subject mortgage under the terms and conditions stated herein to afford opportunity to effect reinstatement.

1. On or before the 10th of each month commencing May, 1971 and continuing through April, 1976 there shall be submitted:

A. A monthly payment during the first year equal to service charges, tax accruals, current interest plus ⅟₆₀th of the outstanding interest delinquency through April 30, 1971.

B. A monthly payment during the second year equal to service charges, tax accruals, current interest and ⅟₆₀th of the outstanding interest delinquency through April 30, 1971 plus a supplemental payment equivalent to the regular monthly amortization installment.

* * * * * *

5. These arrangements will extend through April 1976 and given compliance with the terms of the Arrangements, the Secretary will take no action prior to April 30, 1976 on account of the existing monetary default.

Defendant argues that a literal reading of this agreement reveals that it does not specify what payments are to be made in the third through fifth years of the agreement. Since May 1973 begins the third year, it is argued, defendant is not in default by failing to submit monthly amortization payments. On the other hand, paragraph 1 calls for payments commencing May 1971 and continuing through April 1976. The Government contends that in view of the stated purpose of the agreement to "afford opportunity to effect reinstatement" at the end of the five-year period, the agreement should be construed to require amortization payments beginning during the second year and continuing in the three subsequent years.

 In construing this agreement, it is clear that I must apply principles of general contract law. Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947). I find the agreement in the pertinent portion to be sufficiently ambiguous on its face to permit the consideration of parol evidence to determine the intention of the parties.[20] I find relevant to this de-

19. *See* opinion dated September 21, 1973.

20. *See* Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969):

It is generally stated that the fundamental or paramount question in the legal construction of all contracts is a determina-

termination the circumstances surrounding the negotiation and execution of this agreement, and the parties' subsequent conduct.

The sequence of the negotiations of the agreement has been previously detailed. (*See* pages 325–327 *supra*). It is noted that from the outset Mr. Padula only sought for the defendant the deferment of principal payments for one year. After repeated negotiations Mr. Kalish wrote Mr. Padula on April 16, 1971 setting forth the minimum conditions he would accept in such an agreement. That letter did not refer to amortization payments only during the second year, but referred to such payments "beginning the second year" (J.E. 26). When the agreement was drafted by HUD, however, it was only to run for a two-year period and accordingly provided for payments for the first and second years only. Kalish testified that although the agreement called for a five-year payment plan to cure the delinquencies, providing for payments of ⅟₆₀th per month, he wanted it to only run for two years initially to enable a reevaluation to occur at that point to determine defendant's progress and the interest of the Secretary in continuing for another three-year term. It is noted that in all places where the workout agreements refer to the year 1976, there is in each of those places the initial "P" representing the changes made by Mr. Padula after a telephone conversation with Mr. Kalish.

■■■ When the agreements were received by Mr. Padula, he thought them in error as he believed he had discussed a five-year term for them. He called Mr. Kalish, stating he needed a five-year term to assist in his funding the Chapter XI plan, by enabling him to give the court more assurance that a foreclosure would not occur for five

years rather than two years. Mr. Kalish gave up his right to reevaluate the plan after two years and permitted Mr. Padula to make the desired changes extending the plan for five years. The changes were made by Mr. Padula and accepted by Mr. Kalish. Thus we have an agreement changed from two years to five years but with payments scheduled for only the first and second years and with no alteration in the payments schedule to reflect the five-year term.

In light of these circumstances I find that the parties had intended that the payments reflected in 1B should be continued throughout the three-year extension. To properly reflect this intention, when Mr. Padula extended the termination date, he should have also altered the language in paragraph 1B calling for payments "during the second year" to "beginning the second year." I find this omission an error that was not found by Mr. Kalish when he received the returned copy. I thus conclude that the parties intended that defendant make fixed amortization payments for the third through fifth years in return for HUD's additional promise to withhold on foreclosure for those additional three years, and relinquishment of its right to reevaluate defendant's progress after a two-year period.

■■■ The agreement certainly should not be construed to require no payment whatsoever for these additional years as this would make it meaningless in light of its stated purpose of eliminating the monetary deficiencies on the mortgages. As stated in Pan American Realty Trust v. Twenty One Kings, Inc., 408 F.2d 937, 939 (3d Cir. 1969):

A cardinal principle governing the construction of contracts is that the entire contract must be considered and, as between possible interpreta-

tion of the real intention of the parties. . . . A contract must be construed as a whole and wherever possible, effect will be given to all its parts. . . . A construction which renders performance of the contract possible will be adopted, rather than one which renders its performance

impossible or meaningless, unless the latter construction is absolutely necessary. . . . Where ambiguity exists, the minor provisions must be construed as not to conflict with the main purpose of the contract. . . . [citations and footnotes omitted] 405 F.2d at 1131.

tions of ambiguous provisions, that will be chosen which best accords with the sense of the remainder of the contract. A written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided.

Recognizing the futility of such a construction, defendant argues not that it is free from payments altogether during the last three years, but that the amount of such payments, and the question of whether amortization would be required, was to be determined in April 1973 and would depend upon defendant's financial ability to make payments; and amortization payments could be required if it was determined that defendant had sufficient revenues to make such payments. With such a construction defendant is seeking the best of both worlds, both before the Padula changes, and after. Mr. Padula desired a five-year agreement to assure the bankruptcy court that foreclosure would not occur for such a period. He specifically rejected the two-year agreement sought by HUD, which permitted a further evaluation of the payments for the third and subsequent years, and now seeks to obtain that very benefit, although for defendant only, by construction of the five-year agreement. Such a right was lost when the five-year agreement was entered into and cannot now be reclaimed. Initially under the two-year agreement HUD would have had the option to reconsider a continuation of the agreement after two years, and presumably defendant at that time would have been able to argue for smaller payments. Once the agreement was executed for a five-year term, however, both sides became bound under its provisions for that period. Thus I find the only reasonable construction of the agreement that would give meaning to the intention of the parties at the time of execution is to construe paragraph 1B as additionally applying to the third through fifth years, requiring amortization payments to be continued throughout that period.

I find this interpretation further supported by the subsequent conduct of the parties.

On January 21, 1972, in recognition of the fact that amortization payments were to begin in May 1972, Mr. Padula wrote to HUD "to extend the . . . Provisional Work Out Arrangements for a period of 6 months under the same terms and conditions" (J.E. 35). On February 18, 1972, he obtained HUD's "permission to continue payments under the Provisional Work-Out Arrangements without change for a period of six months." (J.E. 34). He requested a further 12-month extension of current payments under the workout agreements on July 24, 1972, and again received permission, dated October 10, 1972, "to postpone until May 1, 1973, the date for beginning the supplemental payment" equal to the regular monthly amortization installment as required by Paragraph 1B of the agreements. The fact that this permission was only a deferment of the commencement of amortization, and not a waiver of such payments, is found in defendant's financial statement for the fiscal year ending September 30, 1972, where note 3 specifically refers to the agreement to "defer amortization" until April 1973 (J.E. 95f).

Since defendant obtained these extensions, and never commenced making amortization payments during the second year, for its theory of construction to be valid, it would have to consider the extensions as a waiver of the second-year workout requirements, enabling it to proceed in May 1973 to the third-year requirements. This is so because if the extensions were not considered a waiver but instead merely a deferral, the amortization payments due during the second year would have to be paid beginning May 1973, instead of having that year's payments waived altogether. However, the "waiver" interpretation is contradicted by the language used by HUD and in defendant's financial statement referring to deferrals to May 1973. Further indication of Mr. Padula's knowledge of defendant's obligation to

commence amortization payments in May 1973 is found in his April 18, 1973 request to "continue to postpone until May 1, 1974 the deferral of amortization [and] reserve for replacement . . . ." (J.E. 49). If Mr. Padula was not of the understanding that the agreements required amortization payments to commence May 1973, he certainly would not have requested a further postponement of the deferral he had previously obtained. His request, however, this time was denied by HUD's letter of May 1, 1973 (J.E. 50). Nevertheless, on May 10, 1973, the defendant forwarded to HUD checks which failed to include a supplemental payment equivalent to the regular monthly amortization installment (St. 59–62).

Thus I find that the workout agreements required the commencement of amortization payments in May 1973 and that the defendant failed to make such payments, which failure constituted a further breach of the workout agreements. I find this failure not justified because of insufficient revenues, for the reasons that will be discussed subsequently.

## AFFIRMATIVE DEFENSES

Defendant seeks to invoke this court's equity powers to prevent foreclosure on the ground that it was HUD itself which caused any default herein. Plaintiff does not dispute that in an appropriate case the court can deny foreclosure to the Government for the acts of its officials, but contends that such a claim is not factually supportable on the instant record. This court agrees. Indeed, if there was any unconscionable conduct by the parties, it was that of defendant's principal, Mr. Padula, and not HUD officials, as will hereinafter appear.

■ Defendant first contends that plaintiff intentionally caused the default resulting from the payment of Jersey City service charges by (1) failing to require from defendant escrow payments in an amount sufficient to meet the service charges due after defendant had specifically requested that HUD take such action, by letter dated March 10, 1972 (J.E. 107), pointing out the escrow shortage, and (2) by paying the 1971 service charge to Jersey City before it was due. I have previously considered and rejected the latter contention as meritless. Regarding the former, I cannot understand how any failure on HUD's part to increase estimated accruals relieves defendant of a liability for the amounts actually paid by HUD for defendant's actual service and water charges. Defendant accumulated the difference and, had it not diverted it to the Chapter XI proceeding, would have had it available to repay HUD. I specifically reject defendant's allegation that the acts of plaintiff's agents were intentionally calculated to cause defendant's default. The record is absolutely barren of any evidence to support such a ridiculous assertion. What is reflected is infinite patience and tolerance in the face of breaches of promises and commitments, culminating in the December 1972 transfers.

Remaining is defendant's contention that HUD has caused any default herein as a result of its failure to approve meaningful rent increases by defendant so as to enable it to meet its obligations. It is further alleged, by way of counterclaim, that such a failure has also denied defendant a reasonable return on its investment to which it is entitled. These claims are equally without merit.

The defendant, to benefit from the National Housing Act, 12 U.S.C. § 1701 et seq., placed itself under certain restrictions and regulations. Section 220 of the National Housing Act, as amended, which governs the mortgages of the defendant, provides that:

The mortgaged property shall be held by—

\* \* \* \* \* \*

. . . limited dividend or redevelopment or housing corporations or other legal entities restricted by or under Federal or State laws or regulations of State banking or insurance

departments as to rents, charges, capital structure, rate of return, or methods of operation. 12 U.S.C. § 1715k(d)(2)(B).

As a result of defendant's status as a limited dividend housing corporation, its stockholders are prohibited by New Jersey law from receiving from the corporation in repayment of their investment, any sums in excess of the face amount of that investment, plus cumulative dividends which exceed a rate of eight percent per year. N.J.S.A. 55:16–5. Moreover, the State has the power to regulate the defendant's schedule of rents, N.J.S.A. 55:16–16(4); and the defendant's certificate of incorporation (J.E. 94) specifically provides that the defendant will be regulated as to rents and tenant occupancy and that the defendant will enter into a regulatory agreement with the Federal Housing Commissioner in order to comply with the provisions of the National Housing Act.

On February 4, 1965 and February 10, 1967, the defendant entered into identical regulatory agreements with the Federal Housing Commissioner for GP 2 and GP 1, respectively (St. 20a, J.E. 15; St. 12a, J.E. 8). Under the regulatory agreements, HUD sets the limits on what the maximum amount of the rental will be on the projects, based on data submitted by the owner and approved by HUD. Paragraph 4(c) of the agreements provides that:

> The Commissioner will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:
>
>> (i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which the owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.[21]

Defendant applied for rental increases for GP 1 and 2 on June 24 and June 28, respectively, immediately after the execution of the workout agreements. On these dates letters went to HUD's Newark Area Office requesting authority to increase GP 1 rents 8.5 percent and GP 2 rents 15 percent, and were accompanied by 1971 operating budgets (J.E. 70, 71). It is interesting to note that, although under the workout agreements at this time, no amortization payments were required to be made until May 1972, the budgets accompanying the applications showed payments to be made that included over $160,000 for amortization. The letters stated that, due to increased operating expenses, the workout agreement could not be "carried out" without rent increases.

Defendant's position has been that, at the time the workout agreements were executed, it had an understanding with HUD that defendant would seek rent increases, and that to enable defendant to make the second-year amortization payments, sufficient increases would be granted. I find there was no such understanding that rent increases would be granted, or that defendant's obligations under the workout agreements were conditioned upon receiving a sufficient increase. Mr. Kalish of HUD, in testimony I find credible, stated that a stepping up of payments in a workout agreement could not be conditioned upon an absolute certainty that HUD would allow a rent increase. Although he could not recall whether Mr. Padula stated it was his intention to apply for a rent increase, under the regulatory agreement the defendant certainly had a right to apply for an increase but that such applications were determined by applying a mechanical formula, and thus Mr. Kalish could not assure Mr. Padula that he would automatically receive an increase when the time came for his increased

---

21. The court also has before it a detailing of the internal HUD rules governing GP 1 and 2 rental increase applications. *See* J.E. 92a and 92b.

payments. The success of the application would depend upon the figures to which the formula would be applied. He specifically denied that there was any understanding that the second-year amortization payment was contingent upon the certainty of HUD granting a rent increase (T. 49). I credit and accept this testimony.

In any event, defendant's rent increase applications were processed by HUD and provisionally approved by letter dated August 5, 1971, accompanied by blank rent schedule forms which were to be completed by defendant and returned to HUD for final approval. HUD did not receive the completed forms until August 23, 1971 (J.E. 76); however, on August 15, 1971, pursuant to the Economic Stabilization Act of 1970,[22] the President issued Executive Order No. 11615 creating a ninety day freeze on all rents, wages and prices. On August 17, 1971 the Newark Area Office of HUD received a teletype ordering compliance with the President's Order and directing that no rental increases be approved (St. 95, J.E. 72). As a result, HUD did not approve the defendant's rent schedule received on August 23, 1971 (J.E. 76).

▮▮ Defendant argues that these rent applications were not properly processed under HUD's Insured Project Servicing Handbook requiring applications for rent increases to be acted upon expeditiously. I find that HUD's August 5, 1971 response to the June 24 and June 28, 1971 applications did not per se constitute untoward delay as to violate HUD's internal rule. The further delay until after the announcement of the

President's rent freeze was caused by defendant. I also find that notwithstanding the provisions of the regulatory agreement requiring applications to be approved or denied accompanied by the reasons for denial, HUD was justified in suspending further action on the applications as a result of the freeze.

After receiving two separate inquiries from defendant in November 1971 (St. 96–97, J.E. 73–75), HUD replied by letter of December 9 that it could not take action on the applications but that it anticipated shortly receiving authority to process applications consistent with the regulations of Phase II of the Economic Stabilization program (St. 98, J.E. 76). Such authority was received by HUD on or about December 30, 1971 (St. 99, J.E. 77), and on January 31, 1972 approval was given for rent increases of approximately 8.5 percent and 8.9 percent for GP 1 and GP 2 respectively. The letter of approval stated that the increases were based on increased operating expenses and computed in accordance with the Price Commission regulations (St. 100a, 101a, J.E. 78, 81). These letters also contained further HUD forms that had to be completed by defendant for final approval; the forms were completed and returned on February 7 and 8, 1972, and final approval was obtained on or about March 1, 1972 (St. 100b, c; 101b, c; J.E. 79, 80, 82, 83). Commencing on or about May 1, 1972, defendant implemented a program of increased rents (St. 102). The increases of course did not immediately affect all premises, as the increases could not be implemented on those apartments that were not on month-to-month tenancies until leases periodically expired.[23]

---

22. *See* notes accompanying 12 U.S.C.A. § 1904.

23. As a result of the implementation of rent increases, the number of vacancies increased between March 12 and November 5, 1972 from 22 to 78 for GP 1 and from 12 to 61 for GP 2 (J.E. 100, 101). Defendant, however, contends that it was not harmed by this increased vacancy factor as the projects at all times received almost the maximum allowable gross rentals for the projects.

This contention is supported by a study of rent increases prepared by defendant in late 1972 and early 1973 which indicates rent increases in excess of that permitted under the Price Commission guidelines (St. 135, J.E. 117, 118). Thus it appears that as vacancies increased, defendant further increased rents of those remaining, in excess of that permitted by the Price Commission, to maintain the maximum gross rents permitted by HUD.

Meanwhile, as previously stated, on January 21, 1972 Mr. Padula wrote for a six-month deferment of the amortization payments scheduled to begin in May 1972 and received approval of his request by letter of February 18, 1972 (J. E. 34, 35). Mr. Kalish testified that such approval was granted in part on the fact that the rent increase application had not been earlier approved (T. 51). Again a further deferment of amortization from May 1972 to May 1973 was sought on July 24, 1972 and approval was given for this request on October 10, 1972 (J.E. 110a and b, 36). Although counsel for defendant attempted to elicit from Mr. Kalish that the second deferment was based on defendant's increased operating expenses, his testimony was that the second deferment was based in part upon the realization that defendant was facing increased tax escrow payments for the 1972 service charge, and water and sewage charges (T. 51–52). It is noted however that these increased escrows were never paid by defendant.

On January 11, 1973 federal economic controls over rents were removed by Executive Order 11695 (38 F.R. 1473), but on February 20, 1973 a rent leveling ordinance was enacted by the City of Jersey City permitting increases tied to the Consumer Price Index and under other specified conditions (St. 122, J.E. 104).[24]

Despite the existence of the rent leveling ordinance, and when defendant had knowledge that foreclosure was imminent, on July 25, 1973 Mr. Padula, for defendant, made application to HUD for a further rent increase of approximately 20 percent for GP 1 and 11 percent for GP 2. (St. 103, 104, J.E. 84, 86). These applications were made notwithstanding a substantial vacancy rate.[25] Supplements to these applications were submitted by defendant on August 20, 1973 (St. 103, 104, J.E. 85, 87) but final processing of these applications was not performed by HUD in view of the commencement of the instant action on September 11, 1973.

It is the position of the defendant that any default under the workout agreements is the result of plaintiff's failure to grant timely and sufficient rent increases. It is contended that the substantial increase of defendant's operating expenses, without significant rent increases, made it impossible for defendant to meet its obligations. I have found, however, that plaintiff did not breach any of the obligations by not approving the June 1971 rent increase applications until early 1972 as a result of superceding federal law in the form of the Economic Stabilization Act. It is noted that despite the computation of the rent increases by HUD consistent with the Price Commission regulations, defendant received approximately the desired increase for GP 1 and even a larger increase for GP 2, although not as large as the amount desired. Moreover, since the applications showed amortization payments of over $1,500,000 to be made when none were at the time due until November 1972, defendant was further benefited. However, defendant claims that since the applications were

---

24. On May 31, 1973, counsel for defendant wrote to HUD stating his belief that the Jersey City ordinance conflicted with the authority of HUD as applied to defendant and was therefore invalid under the Supremacy Clause of the United States Constitution. He inquired as to whether HUD was contemplating any action or whether he should commence his own action (St. 134, J.E. 116). After the commencement of the instant foreclosure action, counsel for defendant commenced an action attacking the Jersey City ordinance in the Superior Court of New Jersey, Law Division, and received an adverse ruling on January 17, 1974. An appeal of that ruling is contemplated by defendant, although the court is not yet aware of any appeal as of yet being filed. It is noted that this court had before it an action challenging a similar rent leveling ordinance on the same grounds and on August 8, 1973 denied an application for a preliminary injunction. *See* Helmsley v. Borough of Fort Lee, 362 F.Supp. 581 (D.N.J.1973).

25. As of July 20 and 22, 1973, GP 1 had 69 vacancies of a total of 390 units and GP 2 had 84 vacancies of a total of 400 units (J. E. 100, 101).

based on past expenses rather than estimates of future expenses, as a result of inflation and the eight-month delay, the increase granted applied to costs that had since greatly increased, and thus any benefit to defendant of such increases was negated. It is noted, however, that defendant was at that point free to make a request for further increases based upon these subsequently increased expenses. No such further application was made, however, for seventeen months, until July 25, 1973, when to defendant's knowledge foreclosure was imminent.

■ Moreover I reject the position that the obligations under the workout agreement were conditioned upon HUD's granting of rent increases. At no place does this agreement so provide. The agreements were negotiated after defendant had substantially defaulted under its mortgages and constituted an attempt to enable defendant to lift itself from its default. Defendant had the right to apply for rent increases, and to the extent that its increased costs justified such increases in rent under the mechanical formula HUD applied, increases would be granted. But I find no special arrangement whereby defendant was guaranteed rent increases or whereby its obligations under the workout agreements were conditioned upon such increases. It is true that defendant suffered delay in being able to implement rent increases as a result of the implementation of federal rent controls; however, relief was afforded defendant by HUD in deferring the requirement to commence amortization payments. A further twelve-month deferment was granted even though HUD had to advance almost $80,000 of its own moneys to Jersey City to cover the service charge and water and sewage charges due. This further deferment was granted to permit defendant to make its increased tax escrow payments. Notwithstanding this assistance, defendant did not in fact reimburse HUD for the moneys advanced to Jersey City nor make the increased tax escrow payments

required although it had sufficient funds to do so. Instead it diverted over $395,000 of its funds, constituting almost all the defendant's cash, to the Chapter XI debtors in violation of the workout agreement. If defendant was then unable to meet its obligations, it was a result of such a substantial diversion of its funds and not as a result of the acts of HUD. However, instead of even attempting to meet the increased payments required, in 1973 defendant continued to advance moneys to affiliates in the form of "loans" that were prohibited under the workout agreement. It was not until after HUD recognized the nature of defendant's actions, and had decided to proceed with foreclosure, that it denied Mr. Padula's request made on defendant's behalf, to further extend the commencement of amortization payments that were to commence May 1973. It appears to now be too late to claim that defendant's difficulties meeting the contract obligations were caused by a failure to obtain rent increases, when in fact no such applications for rent increases were made from March 1972 throughout the period where a default began for failure to account for the service charges and tax escrows in October 1972, and continuing through the commencement of the obligation to make amortization payments in May 1973 until July 1973. I conclude that any inability of defendant to meet its obligations was caused by the actions or omissions of its employees, particularly the substantial diversion of its funds to the Chapter XI debtors. I therefore reject defendant's claim that the default was caused by HUD.

■ It is also contended in defendant's answer, although not further presented to the court by way of brief or testimony, that plaintiff's acts of accepting payment under the workout agreements up to and including August 1973 constituted a waiver of default. I reject this contention. Defendant was at all times aware of HUD's position and was not led to believe that foreclosure would be waived. In October 1972

defendant was informed of what its new payments would be, reflecting adjusted tax escrows, and when those payments were not made, repeated communications were received by defendant informing it of the amounts due and containing demands for payment of these amounts. Nevertheless, Mr. Padula then had almost all of GP II's cash transferred to the Chapter XI debtors. Even before HUD became aware of Mr. Padula's December 1972 actions, in January 1973 it informed him that defendant's failure to repay moneys due by the end of January would result in foreclosure proceedings being commenced. The evidence does not show that plaintiff ever retreated from this position. Mr. Padula applied for a further deferment of amortization payments and this application was denied. Mr. Padula proposed a modified payment plan in May 1973 and this plan was specifically rejected in June 1973 (J.E. 55). Further breaches occurred in June and July 1973 when additional sums of defendant's funds were advanced by Mr. Padula to GP II's affiliated projects. These advances did not become known to HUD until after the commencement of the instant action, as a result of defendant's failure to submit the June and July 1973 monthly reports reflecting these transactions, which were not submitted until December 14, 1973 (St. 137). Such failure to timely submit the reports constitutes a further breach of the workout agreements. In light of the totality of the relevant facts I cannot conclude that HUD's receipt of partial payment on the workout agreements, when viewed with its other conduct, constituted a waiver of its right to foreclose. Accordingly I reject defendant's affirmative defenses to foreclosure.

## COUNTERCLAIM

Defendant's counterclaim is founded on reasoning similar to its affirmative defense based upon its failure to obtain rental increases, but further requests affirmative recovery for a fair return on its investment. The counterclaim is based upon the fact that FHA form 2264–Project Income Analysis and Appraisal, when initially completed by HUD to determine the amount of mortgage the Government would insure, contemplated a yield on the two projects. It is alleged that in the face of rising costs "HUD has refused and neglected to grant any timely, meaningful increases in rent which would offset these costs and even permit a break-even point, much less a profit." It is claimed that HUD has caused defendant's inability to meet its commitments to HUD, primarily by failing to act upon rent increases until they became moot by circumstances. Defendant charges HUD with a breach of contract and negligence with respect to the administration of the projects, and claims that plaintiff is the proximate cause of its not being able to earn a fair return on its investment. The breach of contract is claimed to be that "implicit in the totality of the agreements entered into between the Plaintiff and Defendant . . . ." As to relief, plaintiff seeks $750,000 as the minimum return to which it is entitled, based on the return shown on FHA's 2264 forms; an injunction against foreclosure; that defendant be permitted to make payments under paragraph 1A of the workout agreements (excluding amortization payments) until rents are sufficiently increased to permit compliance with paragraph 1B; and an order directing plaintiff to accept reimbursement for the 1971 service charges advanced, and reinstatement of the mortgages and workout conditions subject to these conditions. As its jurisdictional basis, defendant pleads 12 U.S.C. § 1702 which authorizes the Secretary of HUD in his official capacity to sue and be sued in any court of competent jurisdiction.

■■■■■ The Government contests this court's jurisdiction over this counterclaim. Defendant's counterclaim does not allege a jurisdictional statute conferring jurisdiction over its counterclaim. Section 1702 of Title 12 does not confer jurisdiction but is merely a waiver of sovereign immunity on the part of the

Secretary of HUD. Korman v. Federal Housing Administrator, 72 U.S.App.D.C. 245, 113 F.2d 743 (1940); Harms v. Federal Housing Administration, 256 F. Supp. 757 (D.Md.1966); Choy v. Farragut Gardens, 131 F.Supp. 609, 613 (S. D.N.Y.1955). *See* Sarner v. Mason, 228 F.2d 176, 178 (3d Cir. 1955), cert. denied, 351 U.S. 924, 76 S.Ct. 781, 100 L. Ed. 1454 (1956). Even assuming an allegation of jurisdiction under 28 U.S.C. § 1331, the waiver of sovereign immunity on behalf of the Secretary of HUD will not be considered a waiver of such immunity by the United States to permit counterclaims against it affording alternative relief, in such an action, as this, brought by the United States. Federal Housing Administration v. Burr, 309 U.S. 242, 250–51, 60 S.Ct. 488, 84 L.Ed. 724 (1940); United States v. Waylyn Corp., 130 F.Supp. 783 (D.P.R.1955), affirmed, 231 F.2d 544 (1st Cir.), cert. denied, 352 U.S. 827, 77 S.Ct. 40, 1 L.Ed.2d 49 (1956); United States v. Munroe Towers, Inc., 286 F. Supp. 92 (D.N.J.1968). *See* 3 Moore, Federal Practice § 13.29 at 13–752 (2d Ed. 1974). Nor will the institution of suit by the United States comprise an implied waiver of sovereign immunity to afford affirmative relief. A specific waiver is required. United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L. Ed. 888 (1940); United States v. Silverton, 200 F.2d 824, 826 (1st Cir. 1952); United States v. Holder, 292 F.Supp. 826, 828 (S.D.Iowa 1968). Such propositions are not diluted by Fed.R.Civ.P. 13 permitting counterclaims to come within the court's ancillary jurisdiction, as Rule 13(d) specifically provides:

*Counterclaim Against the United States.* These rules shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof.

However, notwithstanding plaintiff's sovereign immunity and Rule 13(d), defendant may assert a claim arising out of the same transaction or occurrence as the original claim by way of recoupment to reduce or defeat the Government's recovery. But such bases will not permit an affirmative recovery, which still requires an independent waiver of immunity. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Federal Saving & Loan Insurance Corp. v. Quinn, 419 F.2d 1014 (7th Cir. 1969); Frederick v. United States, 386 F.2d 481 (5th Cir. 1967); In re Monongahela Rye Liquors Inc., 141 F.2d 864 (3d Cir. 1944); United States v. Summ, 282 F. Supp. 628 (D.N.J.1968); 6 Wright & Miller, Federal Practice & Procedure § 1427 (1971). I find sufficient identity of transaction between defendant's counterclaim and the Government's claim, both based upon the mortgage and other agreements executed by the parties, to permit a recoupment claim by defendant, to the extent its claim may be considered as seeking recoupment. *See* United States v. Gilman, 360 F.Supp. 828, 840 (D.Md.1973). To the extent that defendant's claim for $750,000 for lost profits may be construed as seeking a reduction in the Government's recovery by this amount, it will be permitted as a claim for recoupment. However, defendant's claim seeks more: it seeks to enjoin foreclosure, defeating the Government's claim, and requests an affirmative recovery of $750,000. To seek an affirmative recovery, a specific waiver of sovereign immunity must be relied upon.

Although no such specific statute is alleged to support an affirmative recovery, it is helpful, for purposes of judicial economy, to examine whether there exists such a waiver of sovereign immunity, which, if properly alleged, would support an affirmative recovery on defendant's claim.

To the extent defendant's claim rests upon breach of contract, the provisions of the Tucker Act, 28 U.S.C. §

1346(a)(2), should be examined. This section provides, in pertinent part, that:

> (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims of:
>
> \* \* \* \* \* \*
>
> (2) Any . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon . . . any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Government argues that defendant's claim is not based upon an express or implied contract within the above section, but upon a contract implied in law or quasi contract, founded upon equitable principles and not within the waiver of sovereign immunity contained in § 1346(a). *See* Goodyear Tire & Rubber Co. v. United States, 276 U.S. 287, 293, 48 S.Ct. 306, 72 L.Ed. 575 (1928); United States v. Minnesota Mutual Investment Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911 (1926); Merritt v. United States, 267 U.S. 338, 340–341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); G. T. Fogle & Co. v. United States, 135 F.2d 117, 120–121 (4th Cir.), cert. denied, 320 U.S. 771, 64 S.Ct. 83, 88 L.Ed. 461 (1943); United States v. Munroe Towers, *supra*. However, this question need not be decided, since defendant's contract claim would in any event not fall within the jurisdiction of the district court, as it seeks recovery in excess of $10,000. 28 U.S.C. § 1346(a)(2); Thompson v. United States, 408 F.2d 1075 (8th Cir. 1969); United States v. Munroe Towers, 286 F.Supp. at 94; United States v. Waylyn Corp., 130 F.Supp. at 787.

▮▮▮ Moreover defendant's claim seeking affirmative relief sounding in tort would be controlled by the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2671–2680. The provisions of 28 U.S.C. § 1346(b) are exclusive for tort claims against federal agencies notwithstanding the authority of those agencies to sue and be sued. 28 U.S.C. § 2679. Edelman v. Federal Housing Administration, 382 F.2d 594 (2d Cir. 1967). Defendant's tort claim, based upon the negligent or wrongful acts or omissions of Government employees, is specifically excluded from the provisions of 28 U.S.C. § 2680(a), which excludes actions based upon a Government employee's exercise or failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused, and § 2680(h), excluding actions arising out of "misrepresentation, deceit, or interference with contract rights." United States v. Silverton, 200 F.2d 824 (1st Cir. 1952); United States v. Sherman Gardens Co., 298 F.Supp. 1332 (D.Nev. 1967); United States v. Waylyn Corp., *supra;* United States v. Buffalo Coal Mining Co., 170 F.Supp. 727 (D.Alaska 1959), aff'd., 343 F.2d 561 (9th Cir. 1965).

Therefore no specific waiver of sovereign immunity would permit an affirmative recovery upon defendant's counterclaim. I therefore find that this court possesses jurisdiction over that claim only to the extent it seeks to diminish or defeat plaintiff's recovery.[26]

Moving to the merits of defendant's counterclaim, to the extent that it seeks to prevent foreclosure based upon HUD's failure to grant sufficient rent increases to permit defendant to satisfy its obligations to HUD, it overlaps with defendant's affirmative defense to foreclosure which has already been rejected.

▮▮▮ Defendant's claim for a guaranteed profit is based upon the claimed representations that were made

---

26. Defendant also contends that its counterclaim is within the jurisdiction of this court on the same bases as alleged in Gregory Park Section III, Inc. v. Lynn, Civ.No. 1562–73. However, that action was filed against the Secretary of HUD and charged an arbitrary failure by HUD officials to comply with HUD regulations to amount to a violation of due process, alleging jurisdiction to be based upon 28 U.S.C. §§ 1331 and 1361. *See* opinion filed December 10, 1973. These allegations are not present in the instant counterclaim.

in the FHA form 2264 indicating a return to the sponsor. However, these forms are issued for the benefit of the Government, and not for the benefit of the mortgagor. Under 12 U.S.C. § 1715k(d)(3), Congress restricted the amount of mortgage insurance the FHA could issue upon a project to a fixed percentage of "the Secretary's estimate of replacement cost of the property, as of the date the mortgage is accepted for insurance." Defendant seeks to rely upon the portion of the form entitled "Builders' and Sponsors' profit and risk" which appears under the heading "Estimated Replacement Cost" and is used to arrive at this latter figure. It was clearly established in United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), that a mortgagor does not have any legal right to rely on an FHA appraisal, and that

> by an FHA appraisal, the Government would [not], in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money. 366 U.S. at 709, 81 S.Ct. at 1301.

I therefore find that defendant was not guaranteed any rate of return and had no legal right to rely upon Form 2264. *See also* Henry Barracks Housing Corp. v. United States, 281 F.2d 196, 150 Ct. Cl. 689 (1960); Deseret Apartments, Inc. v. United States, 250 F.2d 457 (10th Cir. 1957); United States v. Chelsea Towers, Inc., 295 F.Supp. 1242 (D.N.J. 1967); United States v. Sherman Gardens Co., 298 F.Supp. 1332 (D.Nev. 1967); United States v. Lawrence Towers, Inc., 236 F.Supp. 208 (E.D.N.Y. 1964).

▪ Nor do I find any validity in defendant's claim, asserted without supporting authority, that even if it had not in fact been guaranteed a profit, the National Housing Act should be construed to guarantee it a profit since it was designed to encourage private investment. Although the Act does attempt to encourage private investment, it does so not by guaranteeing investors a rate of return, but by providing mortgage insurance and enabling mortgages to be obtained by investors at lower interest rates. *See* § 221(d) of the Act, 12 U.S.C. § 1715*l*(d). In administering the Act HUD has promulgated regulations to be applied in determining rental increases which take cognizance of providing a reasonable return on investment. But such consideration is only to be provided as is "consistent with providing reasonable rentals to tenants." 24 C.F.R. § 221.531(c). I therefore reject defendant's construction of the Act guaranteeing it a reasonable rate of return. Accordingly I reject defendant's counterclaim.

For the reasons stated above, I find for plaintiff upon the complaint and against defendant on its counterclaim. An appropriate form of judgment is to be submitted.